David Ovalle

Post Office Box 21193

Los Angeles, California 90021

(213) 926-8399

In Pro Per

I/S
20

Original

Fee Paid

4:09 PM

FILED
CLERK, U.S. DISTRICT COURT

OCT 1 4 2008

CENTRAL DISTRICT OF CALIFORNIA
BY                              DEPUTY

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

## CV08-06751 PSG (SHx)

| | |
|---|---|
| DAVID OVALLE, | ) Americans with |
| | ) Disabilities Act |
| Plaintiff | ) Employment Title VII |
| | ) Discrimination That |
| | ) To My |
| Vs. | ) Wrongful Termination |
| | ) |
| THE FRESNO BEE NEWSPAPERS, | ) Demand For Jury |
| McCLATCHY NEWSPAPERS INC. | ) Trail |
| Defendants | ) |
| | ) Previous Complaint |
| | ) CASE NO. CV07-6669 |

1



v. ?

10/14/2008 4:11:25 PM   Receipt #: 112186
        Cashier : ABELLAMY [LA 1-1]
Paid by: DAVID OVALLE
2:CV08-06751
2009-086900        5 - Civil Filing Fee(1)
                                    $60.00
Amount :
2:CV08-06751
2009-510000        11 - Special Fund F/F(1)
                                    $190.00
Amount :
2:CV08-06751
2009-086400        Filing Fee - Special(1)
                                    $100.00
Amount :                            350.00
Cash  Payment :

As recommended by the court. In compliance No. CV07-6669

David Ovalle v. The Fresno Bee Newspaper, McClatchy Newspapers Inc.

I alleged violation(s) of the Americans with Disability Act Title VII employment law (Discrimination) that led to my wrongful termination.

Due to multi requests and denials to accomodate my condition and associated occasional symptoms as noted on sick leave forms and communicated to members of management and company insurance records reflect that they paid for prescription tinted eyeglasses. Therefore, acknowledgment and discovery of my condition had been established and reasonable accommodation requests were intentionally disallowed.

Including the request to modify my workstation lighting that was denied by department manager due to that "only production artists are entitled to light filters".

It has also been noted that prior to my termination by management, that legal blindness of the left eye that is chronic and degenerative since birth is cause that my vision impairment affects my ability to read fine and up to regular point size print on occasion within a satisfactory or consistant level or manner at times relates to dyslexic associated type symptoms by transposing letters or numbers.

In addition other contributing factors to my pre-existing condition such as everyday work activity or work enviroment sensitivity to light, air or wind and this should include work related shared office equipment contamination or cleanliness such as employee shared phones and computers causing a prone to

occasional L eye infection(s) associated symptoms such as pain, scarring, swelling, redness and watering. Thus resulted in effect and contributing to the sensitivity of my pre-existing condition and my thus inhibiting performance abilities.

It is that within more than a nine year course of employment with The Fresno Bee Newspaper - McClatchy Newspaper Inc. I was employed as a PrePress employee for 1 year and 3 months then promoted to a Advertising Technician position shortly thereafter.

I was temperarily disabled due to a non related injuries stemming from a violent crime. I returned to work after 2 months resuming my new role in the Ad Creation / Design center.

My role as a Ad technician was versitle as some of the requirements consisted of customer service with advertising account clients, account sales representatives, production and editorial employees. My responsibilities consisted of Ad material checking, docket station routing, docket and film stocking, clerical, courier routing, proof reading, layouts and correction mark-ups, missing ads research and accounting including an occasional artwork illustration request.

Based on the missing ad lists statistics within my last 2 years of employment with The Fresno Bee Newspaper. On average I would research and track 4-6 missing ads depending on sections without sales representative assistance. Resulting in that I saved the company tens of thousands of dollars a day in revenue rescue per section and per daily publications.

Revenue that would normally be lost due to department as usual procedures or to do nothing by routine filling of the ad space prior to a publication. Thus qaulifing my ability to perform above

3

expectational or reasonable levels of duty.

These examples should merit requirements by Title VII had I been allowed accomidations or granted my previous requests to save my job.

As per accomidation denials and routine discriminatory scrutinizational tactics by my supervisors that led to my routine hassments and exploitation of disablement a round my co workers, fellow employees or staff.  I was routinely forced to live undue or uneseccasary stress and truamas.

My compensitory damages should be based on the above reasons and lost income and career potentials in the amount of 500,000.

I am petitioning to the United States Courts Central District of California to hear this matter as that both plantiff and defendants are residents of the same state.

Sincerely, David Ovalle - Plaintiff

EEOC Form 161 (3/98)                    U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

## DISMISSAL AND NOTICE OF RIGHTS

| To: | David Ovalle<br>205 W. 214 Street<br>Carson, CA 90745 | From: | Fresno Local Office<br>2300 Tulare Street<br>Suite 215<br>Fresno, CA 93721 |
|---|---|---|---|

| ☐ | *On behalf of person(s) aggrieved whose identity is CONFIDENTIAL (29 CFR §1601.7(a))* | | |
|---|---|---|---|

| EEOC Charge No. | EEOC Representative | | Telephone No. |
|---|---|---|---|
| 485-2006-00272 | Maria Marquez,<br>Investigator | | (559) 487-5795 |

**THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:**

☐ The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

☐ Your allegations did not involve a disability as defined by the Americans With Disabilities Act.

☐ The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.

☐ Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge

☐ Having been given 30 days in which to respond, you failed to provide information, failed to appear or be available for interviews/conferences, or otherwise failed to cooperate to the extent that it was not possible to resolve your charge.

☐ While reasonable efforts were made to locate you, we were not able to do so.

☐ You were given 30 days to accept a reasonable settlement offer that affords full relief for the harm you alleged.

☒ The EEOC issues the following determination: Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge.

☐ The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

☐ Other *(briefly state)*

### - NOTICE OF SUIT RIGHTS -
*(See the additional information attached to this form.)*

**Title VII, the Americans with Disabilities Act, and/or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit **must be filed WITHIN 90 DAYS of your receipt of this notice**; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a state claim may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred more than 2 years (3 years) before you file suit may not be collectible.**

On behalf of the Commission

_____          8/20/07
**Melissa Barrios,**                         *(Date Mailed)*
**Director**

Enclosures(s)

cc:    **Billie S. McConkey, Esq.**
       **7250 E. Alta Sierra Drive**
       **Scottsdale, Arizona 85262**

# EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

## AGREEMENT OF NONDISCLOSURE

Pursuant to Section 705g(1) of Title VII, the EEOC shall have power to cooperate with private individuals in order to accomplish the purposes of Title VII. This same authority also applies to actions under the Americans with Disabilities Act.

### PERSON REQUESTING DISCLOSURE

[X] CHARGING PARTY    [ ] RESPONDENT    [ ] AGGRIEVED PERSON ON WHOSE BEHALF CHARGE IS FILED    [ ] AGGRIEVED PERSON IN COMMISSIONER CHARGE    [ ] NAMED PARTY IN CLASS ACTION

ATTORNEY REPRESENTING

[X] CP    [ ] RESPONDENT    [ ] AGGRIEVED PERSON ON WHOSE BEHALF CHARGE IS FILED    [ ] AGGRIEVED PERSON IN COMMISSIONER CHARGE    [ ] NAMED PARTY IN CLASS ACTION

### CHARGE NUMBER(S) OF FILE(S) TO BE DISCLOSED

485-2006-00272 (Title VII), 90 Day Right to Sue 8-20-07

Court appointed Council federal courthouse los Angeles Central District Court of California

### STATEMENT

I __David Ovalle__, request disclosure of Commission case file(s) in

(Typed name)

connection with contemplated or pending litigation. I agree that the information disclosed to me will not be made public or used except in the normal course of a civil action or other proceeding instituted under Title VII or the Americans with Disabilities Act involving such information.

In witness whereof, this agreement is entered into as of __30__ day of __October__ 20 __07__ by the Equal Employment Opportunity Commission representative named below and the person requesting disclosure.

_____ (213) 944-6543

Person requesting disclosure (Signature and telephone number/area code)

1104 1/2 E. 7th street No. 134 los Angeles, Ca. 90021

Complete address

_____

EEOC representative (Signature and title)

RECEIVED

EEOC FORM 167 (10/94)

OCT 30 2007

EEOC
FRESNO LOCAL OFFICE

Billie S. McConkey
7250 E. Alta Sierra Dr.
Scottsdale, Arizona 85262
Phone: (480) 563-3372
Fax: (480) 563-3862

## **Billie S. McConkey**
### Special Employment Counsel
### The McClatchy Company

# Fax

| | | | |
|---|---|---|---|
| **To:** | Ms. Naomi D. Villa, Investigator | **From:** | Billie S. McConkey |
| **Fax:** | (213) 894-8385 | **Pages:** | 10 |
| **Phone:** | | **Date:** | 10/6/2006 |
| **Re:** | Ovalle/Fresno Bee; 485-2006-00272 | **CC:** | |

☐ **Urgent**   ☐ **For Review**   ☐ **Please Comment**   ☐ **Please Reply**   ☐ **Please Recycle**

● **Comments:.**

Attached you will find the Fresno Bee's Position Statement in the above-referenced matter. Following by UPS Letter will be the Position Statement with all Exhibits. Thank you.

10/6/2006 3:32 PM FROM: McConkey Fax McConkey Law Office  TO: 12138948385   PAGE: 002 OF 010

# Billie S. McConkey

Special Employment Counsel/The McClatchy Company

direct line: 480-563-3372
facsimile: 480-563-3862
email: mcconkeyoffice@cox.net

October 6, 2006

<u>VIA FACSIMILE: (213) 894-8385</u>

Ms. Naomi D. Villa, Investigator
Equal Employment Opportunity Commission
1265 W. Shaw Ave., Suite 103
Fresno, CA 93711

Re:     **Ovalle/Fresno Bee**
        **<u>EEOC Charge Number: 485-2006-00272</u>**

Dear Investigator Villa:

As you know, I represent The Fresno Bee (the "Company" or "The Bee") in the above-referenced matter.  Charging Party, David Ovalle ("Charging Party"), has asserted a claim of discrimination based on gender, national origin and alleged disability.  We have investigated this claim and found it to be completely without merit.  Accordingly, we request that your office dismiss this Charge.  In support of our position, we submit the following as our Position Statement.

## I.    **BACKGROUND**

The Fresno Bee publishes a daily, general interest newspaper and several other publications (weekly newspapers, magazines and custom publications) in the Fresno, California area.  Charging Party was hired in March 1997 in the position of pre-press employee.  Less than 1 year later, Charging Party applied for and was selected for a transfer to the Ad Creation/Design Center ("AC/DC") in the position of Advertising Technician.  For all relevant time periods herein, Charging Party worked as an Advertising Technician in the AC/DC.  See Employee Advancement/Transfer Request, attached as Exhibit A.

The AC/DC is the area of the newspaper responsible for receiving advertisement orders from the Company's sales staff, creating those advertisements, tracking and proofing the advertisements and releasing them for printing in the Company's publications.  Since the newspaper business requires the production of a brand new product each and every day, deadlines are tight in the AC/DC and accuracy is an absolute must.  There is no quicker way to lose the business of an advertiser than to run their

advertisement on the wrong day, in the wrong publication or with mistakes. The employees in the AC/DC are critical to making sure that these types of errors do not occur.

In his position as an Advertising Technician, Charging Party was primarily responsible for proofing and tracking advertisements. In performing his duties, Charging Party would double check advertisement numbers, sizes, fonts and other information to make sure that all advertisements were processed correctly and in accordance with the customer's order. In essence, Charging Party was responsible for making sure that the right advertisement went to the right place and at the right time. See Position Responsibility Questionnaire Excerpt, attached as Exhibit B.

### 2001: Charging Party Begins Demonstrating Accuracy Problems

From the beginning of Charging Party's employment, his manager, Mr. T.J. Gilchrist, was a strong supporter of his success. For instance, in Charging Party's 3-month Performance Progress Report ("PPR"), Mr. Gilchrist praised Charging Party's efforts to learn more about his position and encouraged him to continue to improve upon his skills and accuracy. See 3-month PPR, attached as Exhibit C. Likewise, Charging Party also praised Mr. Gilchrist, stating that "I feel T.J. has provided me with more than adequate guidance." See Exhibit C.

Unfortunately, despite this support, beginning in 2001 Charging Party began demonstrating serious problems with his attentiveness and accuracy. In his 2002 Performance Appraisal, Charging Party was warned that he needed "to be more attentive when checking in ads, clearing proofs and matching ad man tickets to ads." In addressing these accuracy problems, Charging Party's supervisor advised him that "the impact to the production process and ultimately to the customer can be costly." See 2002 Performance Appraisal, attached as Exhibit D.

Also in his 2002 Performance Appraisal, Charging Party was counseled about his poor communication with his co-workers. First, Charging Party was advised that he must communicate with his co-workers about workflow issues and about what duties needed to be completed on the next shift. Second, Charging Party was advised that he needed to make sure he let someone know when he was leaving his work area so that necessary tasks and duties could be completed in his absence. See Exhibit D.

Despite these significant problems, and in an effort to give Charging Party a chance to improve, Charging Party's supervisor still gave him an overall "meets expectations" rating.

### 2002 & 2003: Charging Party's Performance Problems Continue

Unfortunately, despite the warnings contained in his 2002 Performance Appraisal, over the course of the next two years Charging Party's performance problems only grew worse. In his 2003 Performance Appraisal, Charging Party's supervisor reviewed numerous examples of Charging Party's very serious accuracy problems, and stated as follows:

*"David needs to be more attentive to the basics of checking in ads, clearing proofs, matching ad man tickets to ads and having ad numbers restored. During this review period some ads were returned to David before publication with the wrong adman tickets or ads attached to them... David has also missed expired storage numbers when checking in ads this review period resulting in some cases in the delay of production because the A.M. Ad Tech had to have the number restored."*

See 2003 Performance Appraisal, attached as Exhibit E.

Furthermore, like his accuracy problems, Charging Party's communication problems had also continued since his 2002 warning. In his 2003 Performance Appraisal, Charging Party's supervisor noted that he had problems communicating with his co-workers and some co-workers had expressed discomfort with the way that they were treated by Charging Party. Further, his supervisor also noted that Charging Party was very defensive and did not accept constructive criticism. Finally, Charging Party was again advised that he needed to inform a co-worker or supervisor when he was leaving his work area so that proper workflow could be maintained. See Exhibit E.

Due to the continuation of these very serious performance problems, Charging Party was placed on a 90-day performance improvement plan. As part of that plan, Charging Party was required to demonstrate sustained improvement in the areas of accuracy and communication. See 7/30/03 Memo, attached as Exhibit F.

At the end of his 90-day performance improvement period, Charging Party's supervisor issued him a follow-up review, this time noting that Charging Party had made notable improvement. However, Charging Party's supervisor advised him that his continued employment depended upon him sustaining this improvement. Specifically, Charging Party's supervisor stated that "although David has made noted improvements during this 3-month development period, he must continue to improve...management will continue to monitor these areas to insure David is staying on track." See 90-Day Excerpt, attached as Exhibit G.

### 2004 & 2005: Charging Party's Performance Problems Escalate To A Critical Level

Unfortunately, Charging Party's improved performance was only temporary and beginning in 2004, his problems increased to critical levels. For instance, in June 2004 Charging Party was issued a final warning for aggressive and confrontational behavior toward a new employee. See Final Warning Notice, attached as Exhibit H.

Furthermore, in his 2004 Performance Appraisal, he was again warned about his accuracy problems and inattention to detail. In this regard, his supervisor stated as follows:

*"On last year's review, it stated David had demonstrated more attention to the basics of checking in ads, clearing proofs, matching ad man tickets to ads and having ad numbers restored. This has not remained consistent and David's error rate in this area is at an unacceptable level... **immediate and sustained improvement in David's errors must be demonstrated in order for him to remain in his position.***

7250 E. Alta Sierra Dr. • Scottsdale, Arizona 85262

<u>See</u> 2004 Performance Appraisal, attached as Exhibit I.

Despite this clear and direct warning, 2005 brought more performance problems by Charging Party. In his 2005 Performance Appraisal, his supervisor again warned him that his job was in jeopardy if he didn't improve his performance:

> *"On last year's review it stated that David continued to have difficulty in the basics of checking in ads, clearing proofs, matching ad man tickets to ads and having ad numbers restored. This year David is still having problems in this area. Wanda and I have talked to David about these errors numerous times and have suggested ways on how to improve in this area. David has been at Ad Tech for eight years and the error rate in this area is unacceptable.* **Immediate and sustained improvement in David's errors must be demonstrated in order for him to remain in his position.**

<u>See</u> 2005 Performance Appraisal, attached as Exhibit J.

Unfortunately, again, despite these clear warnings that his job was in jeopardy, Charging Party continued to make costly mistakes. Just a week after this performance appraisal, Charging Party committed another error which resulted in several advertisements being processed incorrectly. In response to that mistake, the Company issued Charging Party a written warning, advising him that "without immediate and sustained improvement, you will leave the company no choice but to administer further disciplinary action, up to and including termination." <u>See</u> 8/31/05 Written Warning, attached as Exhibit K.

On Friday October 7, 2005, Charging Party committed another crucial mistake in processing an advertisement which resulted in the wrong advertisement being placed in the newspaper. To make matters worse, the advertisement was for the company's largest client. Although already on written warning, and despite the many warnings given to him over the past several years, Charging Party's supervisor decided to give him one final chance. In lieu of termination, Charging Party was issued a final written warning and suspension. <u>See</u> Final Warning & Suspension, attached as Exhibit L. Charging Party was clearly advised that further errors would result in termination. <u>See</u> Exhibit L.

### <u>2006: Despite 4 Years Of Warnings, Charging Party's Poor Performance Continues & The Company Is Left With No Alternative But To Terminate His Employment</u>

Unfortunately, all of the prior warnings and efforts to help Charging Party improve did not change his declining performance. In 2006, Charging Party's mistakes and errors rose to critical levels, prompting co-workers to begin making complaints about the impact of Charging Party's poor performance.

For instance, in March 2006, 4 different employees wrote e-mails to supervisor T.J. Gilchrist, documenting numerous critical errors committed by Charging Party. These errors included:

7250 E. Alta Sierra Dr. • Scottsdale, Arizona 85262

October 6, 2006
Page 5 of 9

- Failing to generate daily tickets for advertisements;
- Attaching the wrong proofs to the advertisements;
- Using incorrect tracking numbers for advertisements;
- Filing advertisements in the wrong place;
- Placing the wrong advertisements in the wrong tracking folders; and
- Failing to log in advertisements so they could be properly tracked.

See 7 E-mails, attached as Exhibit M.

Despite all of these continued problems, Charging Party's supervisor continued to counsel him and continued to give him additional chances to save his job.

Unfortunately, none of these efforts helped. In April 2006, Charging Party committed another critical mistake which resulted in a major error for one of the Company's important clients. On April 6, 2006, Charging Party was responsible for logging in and releasing 2 advertisements for the Company's client, Jonathan Homes. Jonathan Homes requested to run 2 different advertisements in the newspaper on the same day. The first advertisement was for a neighborhood in Kerman. See Kerman Ad, attached as Exhibit N. The second advertisement was for a neighborhood called Lemoore Country Club Estates. See Lemoore Ad, attached as Exhibit O.

Unfortunately, when Charging Party processed these two advertisements, he failed to double check the advertising tracking numbers against the actual proofs. Thus, Charging Party ended up submitting the same advertisement twice, instead of two separate individual advertisements. Accordingly, the Lemoore Advertisement ran twice and the Kerman advertisement did not make it into the newspaper at all. See Newspaper Page, attached as Exhibit P.

Once this crucial mistake was discovered, Charging Party was suspended pending investigation. After investigating the incident and reviewing Charging Party's extensive record of poor performance, and in light of the fact that Charging Party was already on final warning, Mr. Gilchrist and his boss, Jeff Gledhill, made the decision to terminate Charging Party's employment.

On April 18, 2006, Charging Party's employment was terminated for legitimate, non-discriminatory reasons.

7250 E. Alta Sierra Dr. • Scottsdale, Arizona 85262

10/6/2006 3:32 PM FROM: McConkey Fax McConkey Law Office TO: 121389 PAGE: 007 OF 010

October 6, 2006
Page 6 of 9

## II.    RESPONSE TO CHARGE OF DISCRIMINATION

In his Charge, Charging Party alleges that: (1) he was denied promotional opportunities because of his gender and national origin; and (2) he was terminated because of an alleged disability and denied reasonable accommodation. As established below, Charging Party's allegations are absolutely false.

### A.    Charging Party Was Never Denied Promotional Opportunities Because of His Gender or National Origin

Charging Party's first allegation is that he was denied promotional opportunities because of his gender and national origin. As the evidence below clearly establishes, this allegation is absolutely false.

First, in reviewing Charging Party's employment records for the past 3 years, it is clear that Charging Party has not applied for any promotional opportunities. In accordance with the Company's Employee Handbook, employees wishing to apply for transfers or promotions must complete an "Employee Advancement/Transfer Request" form. See Transfer/Advancement Request Policy, attached as Exhibit Q. Charging Party was clearly aware of this process since he completed the form when he applied for and was transferred to the AC/DC. See Exhibit A. Further, Charging Party also acknowledged having received and reviewed the Employee Handbook. See Employee Acknowledgement, attached as Exhibit R. Despite this clear policy and procedure, Charging Party did not apply for any transfers/promotions for at least the past 3 years.

In accordance with established case law, in order to establish a prima facie case of failure to promote, Charging Party must establish that (1) he belongs to a protected class; (2) **he applied for** and was qualified for the position he was denied; (3) he was rejected despite his qualifications; and (4) the employer filled the position with an applicant not of a protected class. Johnson v. Boys & Girls Club, 2006 WL 1878615 (9th Cir. 2006). Since Charging Party has not applied for any promotions for at least 3 years prior to this Charge, he cannot establish a prima facie case and his allegation that he was denied "promotional opportunities" must be dismissed.

Further, it should be noted that Charging Party's allegation that he was discriminated against in any manner because of his gender and/or national origin is highly suspect considering the compliment of employees in the AC/DC. For instance, of the 31 employees in the department, 10 are Hispanic and 12 are male. In addition, supervisor T.J. Gilchrist has hired 7 new employees in the past 2 years and almost half of them – 3 new hires – are Hispanic. Furthermore, and most compelling, **Charging Party was replaced by a Hispanic male – Mr. Gabriel Ibarra.**

Finally, Charging Party's claim that supervisor T.J. Gilchrist denied him promotional opportunities is even further questionable since Mr. Gilchrist was the one who hired Charging Party into the AC/DC. As stated by the 9th Circuit Court of Appeals in Coghlan v. American Seafoods Co.,

LLC. 413 F.3d 1090 (9th Cir. 2005), "an employer's initial willingness to hire the employee-plaintiff is strong evidence that the employer is not biased against the protected class to which the employee belongs." It simply makes no sense to suggest that Mr. Gilchrist would hire Charging Party, only to then discriminate against him.

Clearly, the Company has no discriminatory animus toward male Hispanic employees and did not take any action, or deny Charging Party any opportunities, because of his gender or national origin.

### B.   Charging Party Was Not Terminated Because of a Disability Nor Denied Reasonable Accommodation

Charging Party's allegation regarding an alleged disability is most perplexing since the Company was completely unaware of any disability and, given the lack of details in his Charge, is still unaware of exactly what condition Charging Party alleges to constitute a qualified disability.

As established case law provides, to present a prima facie case of disability discrimination, Charging Party is required to establish that he is a disabled person under the law. In order to gain protection as a disabled individual, Charging Party must show that he has a "physical or mental impairment that substantially limits one or more of the major life activities." 42 USC §12102. Charging Party has presented no evidence whatsoever to suggest that he meets this requirement.

Further, Courts universally agree that an employer cannot terminate an employee "because of" a disability, when the disability is not known to the employer. See Taylor v. Principal Financial Group, Inc. 93 F.3d 155 (5th Cir.1996); Miller v. National Cas. Co. 61 F.3d 627 (8th Cir.1995); Hedberg v. Indiana Bell Telephone Co., Inc. 47 F.3d 928 (7th Cir.1995).

Here, Charging Party never informed the Company that he had a disability or any other type of serious medical condition, and he never asked for any type of accommodation. In fact, throughout the course of his employment, and in response to his many disciplinary warnings, Charging Party often submitted written rebuttals challenging his discipline and the evaluation of his performance. Despite pages and pages of written responses by Charging Party, not once did he ever mention a medical condition or indicate the need for any type of assistance or accommodation. See Written Rebuttals, attached as Exhibit S.[1]

In reviewing Charging Party's termination in response to this Charge, the Company does recall one vague statement made by Charging Party at the time of his termination. Although the exact comment cannot be recalled, Charging Party did make some statement around the time of his termination about a "problem with his eye." The Company has no way of knowing whether this is the basis of his disability claim. Regardless, such a vague statement certainly cannot be considered notice of a disability. See Morisky v. Broward County, 80 F.3d 445, 448 (11th Cir.1996) (vague or conclusory statements about some general incapacity are not sufficient to put an employer on notice of

---

[1] Charging Party also never filed an internal complaint alleging any type of discrimination – gender, national origin or disability - despite the Company's EEO and Open Door Policy. See Policies, attached as Exhibit T.

a disability under the ADA); <u>see also</u> <u>Huppenbauer v. May Dept. Stores Co.</u>, 99 F.3d 1130 (4th Cir. 1996) (same). Further, even if this constituted notice, which it clearly does not, an employee cannot avoid termination by asserting a disability after the terminable offense has already taken place. <u>See</u> <u>Smith v. Island Transit</u>, 98 F.3d 1346 (9th Cir. 1996).

The bottom line is that the Company had no prior knowledge of any qualifying medical condition and Charging Party never requested any type of assistance or accommodation. As all of the evidence herein demonstrates, Charging Party's termination was the result of one thing only: his continued poor performance despite years of warnings, performance improvements plans and progressive discipline. Accordingly, there simply is no basis for his allegation that the Company terminated him because of a disability or failed to provide a reasonable accommodation.

C.  **Charging Party Was Terminated for Legitimate, Non-Discriminatory Reasons: An Extensive & Established Pattern of Poor Performance**

As the evidence provided herein demonstrates, Charging Party was terminated for legitimate, non-discriminatory reasons.

For more than 4 years Charging Party exhibited serious performance problems in his job. On endless occasions, Charging Party was counseled and warned about these serious problems. As described in more detail above, the extensive progressive discipline and warnings provided to Charging Party were as follows:

- In July 2002, Charging Party was warned in his Performance Appraisal that his error rate and accuracy problems were unacceptable. <u>See</u> Exhibit D;

- In July 2003, Charging Party was again warned about the unacceptable nature of his performance. <u>See</u> Exhibit E;

- In July 2003, Charging Party was placed on a 90-Day Performance Improvement Plan. <u>See</u> Exhibit F;

- In June 2004, Charging Party was issued a final warning for aggressive and confrontational behavior toward a new employee. <u>See</u> Exhibit H;

- In September 2004, Charging Party was warned in his Performance Appraisal that his performance problems had risen to an unacceptable level and his job was in jeopardy. <u>See</u> Exhibit I;

- In August 2005, Charging Party was again warned that his continued poor performance was placing his job in jeopardy. <u>See</u> Exhibit J;

- In August 2005, Charging Party was issued a Written Warning for further performance and accuracy problems. <u>See</u> Exhibit K;

- In October 2005, Charging Party was placed on suspension and given a Final Warning for continued performance problems. See Exhibit L;

- In March 2006, numerous employees began complaining about the negative impact of Charging Party's performance problems. See Exhibit M; and

- In April 2006, Charging Party committed a serious error which resulted in 2 identical ads being run twice in the newspaper and one separate ad being omitted from publication. Finally, Charging Party's employment was terminated for poor performance. See Exhibits N, O & P.

Given Charging Party's extensive record of failing to meet performance standards and all of the progressive discipline issued by the Company, it is clear that he was terminated for legitimate, non-discriminatory reasons.

For all of the reasons detailed above, Charging Party's Charge should be dismissed.

## III.    CONCLUSION

We believe this Position Statement fully responds to all relevant inquiries set forth in the Charge and clearly shows that the Charge of discrimination by David Ovalle is without merit. Accordingly, the Company respectfully requests that the Commission enter a no-cause decision in its favor. Thank you for providing The Fresno Bee with the opportunity to respond to this Charge. If we can be of further assistance to you, please do not hesitate to call.[2]

Very truly yours,

Billie S. McConkey

cc: The Fresno Bee

---

[2] The Company reserves the right to add to or amend its position if and when additional information becomes available.

Billie S. McConkey
7250 E. Alta Sierra Dr.
Scottsdale, Arizona 85262
Phone: (480) 563-3372
Fax: (480) 563-3862

**Billie S. McConkey**
**Special Employment Counsel**
**The McClatchy Company**

# Fax

**To:** Ms. Naomi D. Villa, Investigator      **From:** Billie S. McConkey

**Fax**   (213) 894-8385            **Pages:** 10

**Phone:**                                  **Date:**   10/6/2006

**Re:**   Ovalle/Fresno Bee; 485-2006-00272       **CC:**

☐ **Urgent**     ☐ **For Review**     ☐ **Please Comment**     ☐ **Please Reply**     ☐ **Please Recycle**

● **Comments:.**

Attached you will find the Fresno Bee's Position Statement in the above-referenced matter. Following by UPS Letter will be the Position Statement with all Exhibits. Thank you.

| Post-It® Fax Note | 7671 | Date 10/10/06 | # of pages ▶ 10 |
|---|---|---|---|
| To _Melissa_ | | From _Matlock_ | |
| Co./Dept. _Naomi_ | | Co. _EEOC - LADO_ | |
| Phone # | | Phone # | |
| Fax # _This was faxed here (LA) in_ | | Fax # | |

_stead of to you Hardcopy follows_

# Billie S. McConkey

Special Employment Counsel/The McClatchy Company

direct line: 480-563-3372
facsimile: 480-563-3862
email: mcconkeyoffice@cox.net

_____

October 6, 2006

<u>VIA FACSIMILE: (213) 894-8385</u>

Ms. Naomi D. Villa, Investigator
Equal Employment Opportunity Commission
1265 W. Shaw Ave., Suite 103
Fresno, CA 93711

Re:     **Ovalle/Fresno Bee**
         <u>**EEOC Charge Number: 485-2006-00272**</u>

Dear Investigator Villa:

As you know, I represent The Fresno Bee (the "Company" or "The Bee") in the above-referenced matter. Charging Party, David Ovalle ("Charging Party"), has asserted a claim of discrimination based on gender, national origin and alleged disability. We have investigated this claim and found it to be completely without merit. Accordingly, we request that your office dismiss this Charge. In support of our position, we submit the following as our Position Statement.

## I.     <u>BACKGROUND</u>

The Fresno Bee publishes a daily, general interest newspaper and several other publications (weekly newspapers, magazines and custom publications) in the Fresno, California area. Charging Party was hired in March 1997 in the position of pre-press employee. Less than 1 year later, Charging Party applied for and was selected for a transfer to the Ad Creation/Design Center ("AC/DC") in the position of Advertising Technician. For all relevant time periods herein, Charging Party worked as an Advertising Technician in the AC/DC. See Employee Advancement/Transfer Request, attached as Exhibit A.

The AC/DC is the area of the newspaper responsible for receiving advertisement orders from the Company's sales staff, creating those advertisements, tracking and proofing the advertisements and releasing them for printing in the Company's publications. Since the newspaper business requires the production of a brand new product each and every day, deadlines are tight in the AC/DC and accuracy is an absolute must. There is no quicker way to lose the business of an advertiser than to run their

_____

7250 E. Alta Sierra Dr. • Scottsdale, Arizona 85262

October 6, 2006
Page 2 of 9

advertisement on the wrong day, in the wrong publication or with mistakes. The employees in the AC/DC are critical to making sure that these types of errors do not occur.

In his position as an Advertising Technician, Charging Party was primarily responsible for proofing and tracking advertisements. In performing his duties, Charging Party would double check advertisement numbers, sizes, fonts and other information to make sure that all advertisements were processed correctly and in accordance with the customer's order. In essence, Charging Party was responsible for making sure that the right advertisement went to the right place and at the right time. See Position Responsibility Questionnaire Excerpt, attached as Exhibit B.

### *2001: Charging Party Begins Demonstrating Accuracy Problems*

From the beginning of Charging Party's employment, his manager, Mr. T.J. Gilchrist, was a strong supporter of his success. For instance, in Charging Party's 3-month Performance Progress Report ("PPR"), Mr. Gilchrist praised Charging Party's efforts to learn more about his position and encouraged him to continue to improve upon his skills and accuracy. See 3-month PPR, attached as Exhibit C. Likewise, Charging Party also praised Mr. Gilchrist, stating that "I feel T.J. has provided me with more than adequate guidance." See Exhibit C.

Unfortunately, despite this support, beginning in 2001 Charging Party began demonstrating serious problems with his attentiveness and accuracy. In his 2002 Performance Appraisal, Charging Party was warned that he needed "to be more attentive when checking in ads, clearing proofs and matching ad man tickets to ads." In addressing these accuracy problems, Charging Party's supervisor advised him that "the impact to the production process and ultimately to the customer can be costly." See 2002 Performance Appraisal, attached as Exhibit D.

Also in his 2002 Performance Appraisal, Charging Party was counseled about his poor communication with his co-workers. First, Charging Party was advised that he must communicate with his co-workers about workflow issues and about what duties needed to be completed on the next shift. Second, Charging Party was advised that he needed to make sure he let someone know when he was leaving his work area so that necessary tasks and duties could be completed in his absence. See Exhibit D.

Despite these significant problems, and in an effort to give Charging Party a chance to improve, Charging Party's supervisor still gave him an overall "meets expectations" rating.

### *2002 & 2003: Charging Party's Performance Problems Continue*

Unfortunately, despite the warnings contained in his 2002 Performance Appraisal, over the course of the next two years Charging Party's performance problems only grew worse. In his 2003 Performance Appraisal, Charging Party's supervisor reviewed numerous examples of Charging Party's very serious accuracy problems, and stated as follows:

---

7250 E. Alta Sierra Dr. • Scottsdale, Arizona 85262

October 6, 2006
Page 3 of 9

*"David needs to be more attentive to the basics of checking in ads, clearing proofs, matching ad man tickets to ads and having ad numbers restored. During this review period some ads were returned to David before publication with the wrong adman tickets or ads attached to them...David has also missed expired storage numbers when checking in ads this review period resulting in some cases in the delay of production because the A.M. Ad Tech had to have the number restored."*

See 2003 Performance Appraisal, attached as Exhibit E.

Furthermore, like his accuracy problems, Charging Party's communication problems had also continued since his 2002 warning. In his 2003 Performance Appraisal, Charging Party's supervisor noted that he had problems communicating with his co-workers and some co-workers had expressed discomfort with the way that they were treated by Charging Party. Further, his supervisor also noted that Charging Party was very defensive and did not accept constructive criticism. Finally, Charging Party was again advised that he needed to inform a co-worker or supervisor when he was leaving his work area so that proper workflow could be maintained. See Exhibit E.

Due to the continuation of these very serious performance problems, Charging Party was placed on a 90-day performance improvement plan. As part of that plan, Charging Party was required to demonstrate sustained improvement in the areas of accuracy and communication. See 7/30/03 Memo, attached as Exhibit F.

At the end of his 90-day performance improvement period, Charging Party's supervisor issued him a follow-up review, this time noting that Charging Party had made notable improvement. However, Charging Party's supervisor advised him that his continued employment depended upon him sustaining this improvement. Specifically, Charging Party's supervisor stated that "although David has made noted improvements during this 3-month development period, he must continue to improve...management will continue to monitor these areas to insure David is staying on track." See 90-Day Excerpt, attached as Exhibit G.

### 2004 & 2005: Charging Party's Performance Problems Escalate To A Critical Level

Unfortunately, Charging Party's improved performance was only temporary and beginning in 2004, his problems increased to critical levels. For instance, in June 2004 Charging Party was issued a final warning for aggressive and confrontational behavior toward a new employee. See Final Warning Notice, attached as Exhibit H.

Furthermore, in his 2004 Performance Appraisal, he was again warned about his accuracy problems and inattention to detail. In this regard, his supervisor stated as follows:

*"On last year's review, it stated David had demonstrated more attention to the basics of checking in ads, clearing proofs, matching ad man tickets to ads and having ad numbers restored. This has not remained consistent and David's error rate in this area is at an unacceptable level... immediate and sustained improvement in David's errors must be demonstrated in order for him to remain in his position.*

7250 E. Alta Sierra Dr. • Scottsdale, Arizona 85262

October 6, 2006
Page 4 of 9

See 2004 Performance Appraisal, attached as Exhibit I.

Despite this clear and direct warning, 2005 brought more performance problems by Charging Party. In his 2005 Performance Appraisal, his supervisor again warned him that his job was in jeopardy if he didn't improve his performance:

> "On last year's review it stated that David continued to have difficulty in the basics of checking in ads, clearing proofs, matching ad man tickets to ads and having ad numbers restored. This year David is still having problems in this area. Wanda and I have talked to David about these errors numerous times and have suggested ways on how to improve in this area. David has been at Ad Tech for eight years and the error rate in this area is unacceptable. **Immediate and sustained improvement in David's errors must be demonstrated in order for him to remain in his position.**

See 2005 Performance Appraisal, attached as Exhibit J.

Unfortunately, again, despite these clear warnings that his job was in jeopardy, Charging Party continued to make costly mistakes. Just a week after this performance appraisal, Charging Party committed another error which resulted in several advertisements being processed incorrectly. In response to that mistake, the Company issued Charging Party a written warning, advising him that "without immediate and sustained improvement, you will leave the company no choice but to administer further disciplinary action, up to and including termination." See 8/31/05 Written Warning, attached as Exhibit K.

On Friday October 7, 2005, Charging Party committed another crucial mistake in processing an advertisement which resulted in the wrong advertisement being placed in the newspaper. To make matters worse, the advertisement was for the company's largest client. Although already on written warning, and despite the many warnings given to him over the past several years, Charging Party's supervisor decided to give him one final chance. In lieu of termination, Charging Party was issued a final written warning and suspension. See Final Warning & Suspension, attached as Exhibit L. Charging Party was clearly advised that further errors would result in termination. See Exhibit L.

### 2006: Despite 4 Years Of Warnings, Charging Party's Poor Performance Continues & The Company Is Left With No Alternative But To Terminate His Employment

Unfortunately, all of the prior warnings and efforts to help Charging Party improve did not change his declining performance. In 2006, Charging Party's mistakes and errors rose to critical levels, prompting co-workers to begin making complaints about the impact of Charging Party's poor performance.

For instance, in March 2006, 4 different employees wrote e-mails to supervisor T.J. Gilchrist, documenting numerous critical errors committed by Charging Party. These errors included:

7250 E. Alta Sierra Dr. • Scottsdale, Arizona 85262

Case 2:08-cv-06751-PSG-SH    Document 1    Filed 10/14/08    Page 23 of 50    Page ID #:23

October 6, 2006
Page 5 of 9

- Failing to generate daily tickets for advertisements;
- Attaching the wrong proofs to the advertisements;
- Using incorrect tracking numbers for advertisements;
- Filing advertisements in the wrong place;
- Placing the wrong advertisements in the wrong tracking folders; and
- Failing to log in advertisements so they could be properly tracked.

See 7 E-mails, attached as Exhibit M.

Despite all of these continued problems, Charging Party's supervisor continued to counsel him and continued to give him additional chances to save his job.

Unfortunately, none of these efforts helped. In April 2006, Charging Party committed another critical mistake which resulted in a major error for one of the Company's important clients. On April 6, 2006, Charging Party was responsible for logging in and releasing 2 advertisements for the Company's client, Jonathan Homes. Jonathan Homes requested to run 2 different advertisements in the newspaper on the same day. The first advertisement was for a neighborhood in Kerman. See Kerman Ad, attached as Exhibit N. The second advertisement was for a neighborhood called Lemoore Country Club Estates. See Lemoore Ad, attached as Exhibit O.

Unfortunately, when Charging Party processed these two advertisements, he failed to double check the advertising tracking numbers against the actual proofs. Thus, Charging Party ended up submitting the same advertisement twice, instead of two separate individual advertisements. Accordingly, the Lemoore Advertisement ran twice and the Kerman advertisement did not make it into the newspaper at all. See Newspaper Page, attached as Exhibit P.

Once this crucial mistake was discovered, Charging Party was suspended pending investigation. After investigating the incident and reviewing Charging Party's extensive record of poor performance, and in light of the fact that Charging Party was already on final warning, Mr. Gilchrist and his boss, Jeff Gledhill, made the decision to terminate Charging Party's employment.

On April 18, 2006, Charging Party's employment was terminated for legitimate, non-discriminatory reasons.

10/10/2005  09:59    21389404▩    EEOC-LADD           PAGE  07/10

10/6/2006 3:32 PM  FROM: McConkey Fax McConkey Law Office  TO: 12138940306   PAGE: 007 OF 010

October 6, 2006
Page 6 of 9

## II.    RESPONSE TO CHARGE OF DISCRIMINATION

In his Charge, Charging Party alleges that: (1) he was denied promotional opportunities because of his gender and national origin; and (2) he was terminated because of an alleged disability and denied reasonable accommodation. As established below, Charging Party's allegations are absolutely false.

### A.    Charging Party Was Never Denied Promotional Opportunities Because of His Gender or National Origin

Charging Party's first allegation is that he was denied promotional opportunities because of his gender and national origin. As the evidence below clearly establishes, this allegation is absolutely false.

First, in reviewing Charging Party's employment records for the past 3 years, it is clear that Charging Party has not applied for any promotional opportunities. In accordance with the Company's Employee Handbook, employees wishing to apply for transfers or promotions must complete an "Employee Advancement/Transfer Request" form. See Transfer/Advancement Request Policy, attached as Exhibit Q. Charging Party was clearly aware of this process since he completed the form when he applied for and was transferred to the AC/DC. See Exhibit A. Further, Charging Party also acknowledged having received and reviewed the Employee Handbook. See Employee Acknowledgement, attached as Exhibit R. Despite this clear policy and procedure, Charging Party did not apply for any transfers/promotions for at least the past 3 years.

In accordance with established case law, in order to establish a prima facie case of failure to promote, Charging Party must establish that (1) he belongs to a protected class; (2) **he applied for and was qualified for the position he was denied**; (3) he was rejected despite his qualifications; and (4) the employer filled the position with an applicant not of a protected class. Johnson v. Boys & Girls Club, 2006 WL 1878615 (9th Cir. 2006). Since Charging Party has not applied for any promotions for at least 3 years prior to this Charge, he cannot establish a prima facie case and his allegation that he was denied "promotional opportunities" must be dismissed.

Further, it should be noted that Charging Party's allegation that he was discriminated against in any manner because of his gender and/or national origin is highly suspect considering the compliment of employees in the AC/DC. For instance, of the 31 employees in the department, 10 are Hispanic and 12 are male. In addition, supervisor T.J. Gilchrist has hired 7 new employees in the past 2 years and almost half of them – 3 new hires – are Hispanic. Furthermore, and most compelling, **Charging Party was replaced by a Hispanic male – Mr. Gabriel Ibarra.**

Finally, Charging Party's claim that supervisor T.J. Gilchrist denied him promotional opportunities is even further questionable since Mr. Gilchrist was the one who hired Charging Party into the AC/DC. As stated by the 9th Circuit Court of Appeals in Coghlan v. American Seafoods Co.,

---

7250 E. Alta Sierra Dr. • Scottsdale, Arizona 85262

LLC, 413 F.3d 1090 (9th Cir. 2005), "an employer's initial willingness to hire the employee-plaintiff is strong evidence that the employer is not biased against the protected class to which the employee belongs." It simply makes no sense to suggest that Mr. Gilchrist would hire Charging Party, only to then discriminate against him.

Clearly, the Company has no discriminatory animus toward male Hispanic employees and did not take any action, or deny Charging Party any opportunities, because of his gender or national origin.

**B.  Charging Party Was Not Terminated Because of a Disability Nor Denied Reasonable Accommodation**

Charging Party's allegation regarding an alleged disability is most perplexing since the Company was completely unaware of any disability and, given the lack of details in his Charge, is still unaware of exactly what condition Charging Party alleges to constitute a qualified disability.

As established case law provides, to present a prima facie case of disability discrimination, Charging Party is required to establish that he is a disabled person under the law. In order to gain protection as a disabled individual, Charging Party must show that he has a "physical or mental impairment that substantially limits one or more of the major life activities." 42 USC §12102. Charging Party has presented no evidence whatsoever to suggest that he meets this requirement.

Further, Courts universally agree that an employer cannot terminate an employee "because of" a disability, when the disability is not known to the employer. See Taylor v. Principal Financial Group, Inc. 93 F.3d 155 (5th Cir.1996); Miller v. National Cas. Co. 61 F.3d 627 (8th Cir.1995); Hedberg v. Indiana Bell Telephone Co., Inc. 47 F.3d 928 (7th Cir.1995).

Here, Charging Party never informed the Company that he had a disability or any other type of serious medical condition, and he never asked for any type of accommodation. In fact, throughout the course of his employment, and in response to his many disciplinary warnings, Charging Party often submitted written rebuttals challenging his discipline and the evaluation of his performance. Despite pages and pages of written responses by Charging Party, not once did he ever mention a medical condition or indicate the need for any type of assistance or accommodation. See Written Rebuttals, attached as Exhibit S.[1]

In reviewing Charging Party's termination in response to this Charge, the Company does recall one vague statement made by Charging Party at the time of his termination. Although the exact comment cannot be recalled, Charging Party did make some statement around the time of his termination about a "problem with his eye." The Company has no way of knowing whether this is the basis of his disability claim. Regardless, such a vague statement certainly cannot be considered notice of a disability. See Morisky v. Broward County, 80 F.3d 445, 448 (11th Cir.1996) (vague or conclusory statements about some general incapacity are not sufficient to put an employer on notice of

---

[1] Charging Party also never filed an internal complaint alleging any type of discrimination – gender, national origin or disability - despite the Company's EEO and Open Door Policy. See Policies, attached as Exhibit T.

a disability under the ADA); see also Huppenbauer v. May Dept. Stores Co., 99 F.3d 1130 (4th Cir. 1996) (same). Further, even if this constituted notice, which it clearly does not, an employee cannot avoid termination by asserting a disability after the terminable offense has already taken place. See Smith v. Island Transit, 98 F.3d 1346 (9th Cir. 1996).

The bottom line is that the Company had no prior knowledge of any qualifying medical condition and Charging Party never requested any type of assistance or accommodation. As all of the evidence herein demonstrates, Charging Party's termination was the result of one thing only: his continued poor performance despite years of warnings, performance improvements plans and progressive discipline. Accordingly, there simply is no basis for his allegation that the Company terminated him because of a disability or failed to provide a reasonable accommodation.

**C.      Charging Party Was Terminated for Legitimate, Non-Discriminatory Reasons: An Extensive & Established Pattern of Poor Performance**

As the evidence provided herein demonstrates, Charging Party was terminated for legitimate, non-discriminatory reasons.

For more than 4 years Charging Party exhibited serious performance problems in his job. On endless occasions, Charging Party was counseled and warned about these serious problems. As described in more detail above, the extensive progressive discipline and warnings provided to Charging Party were as follows:

- In July 2002, Charging Party was warned in his Performance Appraisal that his error rate and accuracy problems were unacceptable. See Exhibit D;

- In July 2003, Charging Party was again warned about the unacceptable nature of his performance. See Exhibit E;

- In July 2003, Charging Party was placed on a 90-Day Performance Improvement Plan. See Exhibit F;

- In June 2004, Charging Party was issued a final warning for aggressive and confrontational behavior toward a new employee. See Exhibit H;

- In September 2004, Charging Party was warned in his Performance Appraisal that his performance problems had risen to an unacceptable level and his job was in jeopardy. See Exhibit I;

- In August 2005, Charging Party was again warned that his continued poor performance was placing his job in jeopardy. See Exhibit J;

- In August 2005, Charging Party was issued a Written Warning for further performance and accuracy problems. See Exhibit K;

7250 E. Alta Sierra Dr. • Scottsdale, Arizona 85262

10/10/2006  09:59   2138948     EEOC-LADO     PAGE  10/10
10/6/2006  3:32 PM   ROM: McConkey Fax McConkey Law Office   TO: 12138.   .85   PAGE: 010 OF 010

October 6, 2006
Page 9 of 9

- In October 2005, Charging Party was placed on suspension and given a Final Warning for continued performance problems. See Exhibit L;

- In March 2006, numerous employees began complaining about the negative impact of Charging Party's performance problems. See Exhibit M; and

- In April 2006, Charging Party committed a serious error which resulted in 2 identical ads being run twice in the newspaper and one separate ad being omitted from publication. Finally, Charging Party's employment was terminated for poor performance. See Exhibits N, O & P.

Given Charging Party's extensive record of failing to meet performance standards and all of the progressive discipline issued by the Company, it is clear that he was terminated for legitimate, non-discriminatory reasons.

For all of the reasons detailed above, Charging Party's Charge should be dismissed.

## III.   CONCLUSION

We believe this Position Statement fully responds to all relevant inquiries set forth in the Charge and clearly shows that the Charge of discrimination by David Ovalle is without merit. Accordingly, the Company respectfully requests that the Commission enter a no-cause decision in its favor. Thank you for providing The Fresno Bee with the opportunity to respond to this Charge. If we can be of further assistance to you, please do not hesitate to call.[2]

Very truly yours,

Billie S. McConkey

cc: The Fresno Bee

---

[2] The Company reserves the right to add to or amend its position if and when additional information becomes available.

7250 E. Alta Sierra Dr. • Scottsdale, Arizona 85262

Billie S. McConkey
7250 E. Alta Sierra Dr.
Scottsdale, Arizona 85262
Phone: (480) 563-3372
Fax: (480) 563-3862

**Billie S. McConkey**
**Special Employment Counsel**
**The McClatchy Company**

# Fax

**To:** Ms. Naomi D. Villa, Investigator　　**From:** Billie S. McConkey

**Fax** (213) 894-8385　　**Pages:** 10

**Phone:**　　**Date:** 10/6/2006

**Re:** Ovalle/Fresno Bee; 485-2006-00272　　**CC:**

☐ **Urgent**　　☐ **For Review**　　☐ **Please Comment**　　☐ **Please Reply**　　☐ **Please Recycle**

● **Comments:.**

Attached you will find the Fresno Bee's Position Statement in the above-referenced matter. Following by UPS Letter will be the Position Statement with all Exhibits. Thank you.

| Post-It® Fax Note | 7671 | Date 10/10/06 | # of pages ▶ 10 |
|---|---|---|---|
| To _Melissa_ | | From _Blalock_ | |
| Co./Dept. _Naomi_ | | Co. _EEOC - LADO_ | |
| Phone # | | Phone # | |
| Fax # _This was faxed here (LA) in_ | | Fax # | |
| _stead of to you Hardcopy follows_ | | | |

# Billie S. McConkey

Special Employment Counsel/The McClatchy Company

direct line: 480-563-3372
facsimile: 480-563-3862
email: mcconkeyoffice@cox.net

---

October 6, 2006

<u>VIA FACSIMILE: (213) 894-8385</u>

Ms. Naomi D. Villa, Investigator
Equal Employment Opportunity Commission
1265 W. Shaw Ave., Suite 103
Fresno, CA 93711

> Re: **Ovalle/Fresno Bee**
> **EEOC Charge Number: 485-2006-00272**

Dear Investigator Villa:

As you know, I represent The Fresno Bee (the "Company" or "The Bee") in the above-referenced matter. Charging Party, David Ovalle ("Charging Party"), has asserted a claim of discrimination based on gender, national origin and alleged disability. We have investigated this claim and found it to be completely without merit. Accordingly, we request that your office dismiss this Charge. In support of our position, we submit the following as our Position Statement.

## I. BACKGROUND

The Fresno Bee publishes a daily, general interest newspaper and several other publications (weekly newspapers, magazines and custom publications) in the Fresno, California area. Charging Party was hired in March 1997 in the position of pre-press employee. Less than 1 year later, Charging Party applied for and was selected for a transfer to the Ad Creation/Design Center ("AC/DC") in the position of Advertising Technician. For all relevant time periods herein, Charging Party worked as an Advertising Technician in the AC/DC. <u>See</u> Employee Advancement/Transfer Request, attached as Exhibit A.

The AC/DC is the area of the newspaper responsible for receiving advertisement orders from the Company's sales staff, creating those advertisements, tracking and proofing the advertisements and releasing them for printing in the Company's publications. Since the newspaper business requires the production of a brand new product each and every day, deadlines are tight in the AC/DC and accuracy is an absolute must. There is no quicker way to lose the business of an advertiser than to run their

---

7250 E. Alta Sierra Dr. • Scottsdale, Arizona 85262

# Billie S. McConkey

Special Employment Counsel/The McClatchy Company

direct line: 480-563-3372
facsimile: 480-563-3862
email: mcconkeyoffice@cox.net

October 6, 2006

VIA FACSIMILE:  (213) 894-8385

Ms. Naomi D. Villa, Investigator
Equal Employment Opportunity Commission
1265 W. Shaw Ave., Suite 103
Fresno, CA 93711

Re:    **Ovalle/Fresno Bee**
       **EEOC Charge Number: 485-2006-00272**

Dear Investigator Villa:

As you know, I represent The Fresno Bee (the "Company" or "The Bee") in the above-referenced matter. Charging Party, David Ovalle ("Charging Party"), has asserted a claim of discrimination based on gender, national origin and alleged disability. We have investigated this claim and found it to be completely without merit. Accordingly, we request that your office dismiss this Charge. In support of our position, we submit the following as our Position Statement.

## I.    BACKGROUND

The Fresno Bee publishes a daily, general interest newspaper and several other publications (weekly newspapers, magazines and custom publications) in the Fresno, California area. Charging Party was hired in March 1997 in the position of pre-press employee. Less than 1 year later, Charging Party applied for and was selected for a transfer to the Ad Creation/Design Center ("AC/DC") in the position of Advertising Technician. For all relevant time periods herein, Charging Party worked as an Advertising Technician in the AC/DC. See Employee Advancement/Transfer Request, attached as Exhibit A.

The AC/DC is the area of the newspaper responsible for receiving advertisement orders from the Company's sales staff, creating those advertisements, tracking and proofing the advertisements and releasing them for printing in the Company's publications. Since the newspaper business requires the production of a brand new product each and every day, deadlines are tight in the AC/DC and accuracy is an absolute must. There is no quicker way to lose the business of an advertiser than to run their

---

7250 E. Alta Sierra Dr. • Scottsdale, Arizona 85262

advertisement on the wrong day, in the wrong publication or with mistakes. The employees in the AC/DC are critical to making sure that these types of errors do not occur.

In his position as an Advertising Technician, Charging Party was primarily responsible for proofing and tracking advertisements. In performing his duties, Charging Party would double check advertisement numbers, sizes, fonts and other information to make sure that all advertisements were processed correctly and in accordance with the customer's order. In essence, Charging Party was responsible for making sure that the right advertisement went to the right place and at the right time. See Position Responsibility Questionnaire Excerpt, attached as Exhibit B.

### *2001: Charging Party Begins Demonstrating Accuracy Problems*

From the beginning of Charging Party's employment, his manager, Mr. T.J. Gilchrist, was a strong supporter of his success. For instance, in Charging Party's 3-month Performance Progress Report ("PPR"), Mr. Gilchrist praised Charging Party's efforts to learn more about his position and encouraged him to continue to improve upon his skills and accuracy. See 3-month PPR, attached as Exhibit C. Likewise, Charging Party also praised Mr. Gilchrist, stating that "I feel T.J. has provided me with more than adequate guidance." See Exhibit C.

Unfortunately, despite this support, beginning in 2001 Charging Party began demonstrating serious problems with his attentiveness and accuracy. In his 2002 Performance Appraisal, Charging Party was warned that he needed "to be more attentive when checking in ads, clearing proofs and matching ad man tickets to ads." In addressing these accuracy problems, Charging Party's supervisor advised him that "the impact to the production process and ultimately to the customer can be costly." See 2002 Performance Appraisal, attached as Exhibit D.

Also in his 2002 Performance Appraisal, Charging Party was counseled about his poor communication with his co-workers. First, Charging Party was advised that he must communicate with his co-workers about workflow issues and about what duties needed to be completed on the next shift. Second, Charging Party was advised that he needed to make sure he let someone know when he was leaving his work area so that necessary tasks and duties could be completed in his absence. See Exhibit D.

Despite these significant problems, and in an effort to give Charging Party a chance to improve, Charging Party's supervisor still gave him an overall "meets expectations" rating.

### *2002 & 2003: Charging Party's Performance Problems Continue*

Unfortunately, despite the warnings contained in his 2002 Performance Appraisal, over the course of the next two years Charging Party's performance problems only grew worse. In his 2003 Performance Appraisal, Charging Party's supervisor reviewed numerous examples of Charging Party's very serious accuracy problems, and stated as follows:

October 6, 2006
Page 3 of 9

> *"David needs to be more attentive to the basics of checking in ads, clearing proofs, matching ad man tickets to ads and having ad numbers restored. During this review period some ads were returned to David before publication with the wrong adman tickets or ads attached to them...David has also missed expired storage numbers when checking in ads this review period resulting in some cases in the delay of production because the A.M. Ad Tech had to have the number restored."*

See 2003 Performance Appraisal, attached as Exhibit E.

Furthermore, like his accuracy problems, Charging Party's communication problems had also continued since his 2002 warning. In his 2003 Performance Appraisal, Charging Party's supervisor noted that he had problems communicating with his co-workers and some co-workers had expressed discomfort with the way that they were treated by Charging Party. Further, his supervisor also noted that Charging Party was very defensive and did not accept constructive criticism. Finally, Charging Party was again advised that he needed to inform a co-worker or supervisor when he was leaving his work area so that proper workflow could be maintained. See Exhibit E.

Due to the continuation of these very serious performance problems, Charging Party was placed on a 90-day performance improvement plan. As part of that plan, Charging Party was required to demonstrate sustained improvement in the areas of accuracy and communication. See 7/30/03 Memo, attached as Exhibit F.

At the end of his 90-day performance improvement period, Charging Party's supervisor issued him a follow-up review, this time noting that Charging Party had made notable improvement. However, Charging Party's supervisor advised him that his continued employment depended upon him sustaining this improvement. Specifically, Charging Party's supervisor stated that "although David has made noted improvements during this 3-month development period, he must continue to improve...management will continue to monitor these areas to insure David is staying on track." See 90-Day Excerpt, attached as Exhibit G.

### 2004 & 2005: Charging Party's Performance Problems Escalate To A Critical Level

Unfortunately, Charging Party's improved performance was only temporary and beginning in 2004, his problems increased to critical levels. For instance, in June 2004 Charging Party was issued a final warning for aggressive and confrontational behavior toward a new employee. See Final Warning Notice, attached as Exhibit H.

Furthermore, in his 2004 Performance Appraisal, he was again warned about his accuracy problems and inattention to detail. In this regard, his supervisor stated as follows:

> *"On last year's review, it stated David had demonstrated more attention to the basics of checking in ads, clearing proofs, matching ad man tickets to ads and having ad numbers restored. This has not remained consistent and David's error rate in this area is at an unacceptable level...**immediate and sustained improvement in David's errors must be demonstrated in order for him to remain in his position.***

---

7250 E. Alta Sierra Dr. • Scottsdale, Arizona 85262

<u>See</u> 2004 Performance Appraisal, attached as Exhibit I.

Despite this clear and direct warning, 2005 brought more performance problems by Charging Party. In his 2005 Performance Appraisal, his supervisor again warned him that his job was in jeopardy if he didn't improve his performance:

> *"On last year's review it stated that David continued to have difficulty in the basics of checking in ads, clearing proofs, matching ad man tickets to ads and having ad numbers restored. This year David is still having problems in this area. Wanda and I have talked to David about these errors numerous times and have suggested ways on how to improve in this area. David has been at Ad Tech for eight years and the error rate in this area is unacceptable. **Immediate and sustained improvement in David's errors must be demonstrated in order for him to remain in his position.**"*

<u>See</u> 2005 Performance Appraisal, attached as Exhibit J.

Unfortunately, again, despite these clear warnings that his job was in jeopardy, Charging Party continued to make costly mistakes. Just a week after this performance appraisal, Charging Party committed another error which resulted in several advertisements being processed incorrectly. In response to that mistake, the Company issued Charging Party a written warning, advising him that "without immediate and sustained improvement, you will leave the company no choice but to administer further disciplinary action, up to and including termination." <u>See</u> 8/31/05 Written Warning, attached as Exhibit K.

On Friday October 7, 2005, Charging Party committed another crucial mistake in processing an advertisement which resulted in the wrong advertisement being placed in the newspaper. To make matters worse, the advertisement was for the company's largest client. Although already on written warning, and despite the many warnings given to him over the past several years, Charging Party's supervisor decided to give him one final chance. In lieu of termination, Charging Party was issued a final written warning and suspension. <u>See</u> Final Warning & Suspension, attached as Exhibit L. Charging Party was clearly advised that further errors would result in termination. <u>See</u> Exhibit L.

### <u>2006: Despite 4 Years Of Warnings, Charging Party's Poor Performance Continues & The Company Is Left With No Alternative But To Terminate His Employment</u>

Unfortunately, all of the prior warnings and efforts to help Charging Party improve did not change his declining performance. In 2006, Charging Party's mistakes and errors rose to critical levels, prompting co-workers to begin making complaints about the impact of Charging Party's poor performance.

For instance, in March 2006, 4 different employees wrote e-mails to supervisor T.J. Gilchrist, documenting numerous critical errors committed by Charging Party. These errors included:

- Failing to generate daily tickets for advertisements;
- Attaching the wrong proofs to the advertisements;
- Using incorrect tracking numbers for advertisements;
- Filing advertisements in the wrong place;
- Placing the wrong advertisements in the wrong tracking folders; and
- Failing to log in advertisements so they could be properly tracked.

See 7 E-mails, attached as Exhibit M.

Despite all of these continued problems, Charging Party's supervisor continued to counsel him and continued to give him additional chances to save his job.

Unfortunately, none of these efforts helped. In April 2006, Charging Party committed another critical mistake which resulted in a major error for one of the Company's important clients. On April 6, 2006, Charging Party was responsible for logging in and releasing 2 advertisements for the Company's client, Jonathan Homes. Jonathan Homes requested to run 2 different advertisements in the newspaper on the same day. The first advertisement was for a neighborhood in Kerman. See Kerman Ad, attached as Exhibit N. The second advertisement was for a neighborhood called Lemoore Country Club Estates. See Lemoore Ad, attached as Exhibit O.

Unfortunately, when Charging Party processed these two advertisements, he failed to double check the advertising tracking numbers against the actual proofs. Thus, Charging Party ended up submitting the same advertisement twice, instead of two separate individual advertisements. Accordingly, the Lemoore Advertisement ran twice and the Kerman advertisement did not make it into the newspaper at all. See Newspaper Page, attached as Exhibit P.

Once this crucial mistake was discovered, Charging Party was suspended pending investigation. After investigating the incident and reviewing Charging Party's extensive record of poor performance, and in light of the fact that Charging Party was already on final warning, Mr. Gilchrist and his boss, Jeff Gledhill, made the decision to terminate Charging Party's employment.

On April 18, 2006, Charging Party's employment was terminated for legitimate, non-discriminatory reasons.

## II.    RESPONSE TO CHARGE OF DISCRIMINATION

In his Charge, Charging Party alleges that:  (1) he was denied promotional opportunities because of his gender and national origin; and (2) he was terminated because of an alleged disability and denied reasonable accommodation.  As established below, Charging Party's allegations are absolutely false.

### A.    Charging Party Was Never Denied Promotional Opportunities Because of His Gender or National Origin

Charging Party's first allegation is that he was denied promotional opportunities because of his gender and national origin.  As the evidence below clearly establishes, this allegation is absolutely false.

First, in reviewing Charging Party's employment records for the past 3 years, it is clear that Charging Party has not applied for any promotional opportunities.  In accordance with the Company's Employee Handbook, employees wishing to apply for transfers or promotions must complete an "Employee Advancement/Transfer Request" form.  See Transfer/Advancement Request Policy, attached as Exhibit Q.  Charging Party was clearly aware of this process since he completed the form when he applied for and was transferred to the AC/DC.  See Exhibit A.  Further, Charging Party also acknowledged having received and reviewed the Employee Handbook.  See Employee Acknowledgement, attached as Exhibit R.  Despite this clear policy and procedure, Charging Party did not apply for any transfers/promotions for at least the past 3 years.

In accordance with established case law, in order to establish a prima facie case of failure to promote, Charging Party must establish that (1) he belongs to a protected class; (2) **he applied for** and was qualified for the position he was denied; (3) he was rejected despite his qualifications; and (4) the employer filled the position with an applicant not of a protected class.  Johnson v. Boys & Girls Club, 2006 WL 1878615 (9th Cir. 2006).  Since Charging Party has not applied for any promotions for at least 3 years prior to this Charge, he cannot establish a prima facie case and his allegation that he was denied "promotional opportunities" must be dismissed.

Further, it should be noted that Charging Party's allegation that he was discriminated against in any manner because of his gender and/or national origin is highly suspect considering the compliment of employees in the AC/DC.  For instance, of the 31 employees in the department, 10 are Hispanic and 12 are male.  In addition, supervisor T.J. Gilchrist has hired 7 new employees in the past 2 years and almost half of them – 3 new hires – are Hispanic.  Furthermore, and most compelling, **Charging Party was replaced by a Hispanic male – Mr. Gabriel Ibarra.**

Finally, Charging Party's claim that supervisor T.J. Gilchrist denied him promotional opportunities is even further questionable since Mr. Gilchrist was the one who hired Charging Party into the AC/DC.  As stated by the 9th Circuit Court of Appeals in Coghlan v. American Seafoods Co.,

LLC, 413 F.3d 1090 (9th Cir. 2005), "an employer's initial willingness to hire the employee-plaintiff is strong evidence that the employer is not biased against the protected class to which the employee belongs." It simply makes no sense to suggest that Mr. Gilchrist would hire Charging Party, only to then discriminate against him.

Clearly, the Company has no discriminatory animus toward male Hispanic employees and did not take any action, or deny Charging Party any opportunities, because of his gender or national origin.

**B.** **Charging Party Was Not Terminated Because of a Disability Nor Denied Reasonable Accommodation**

Charging Party's allegation regarding an alleged disability is most perplexing since the Company was completely unaware of any disability and, given the lack of details in his Charge, is still unaware of exactly what condition Charging Party alleges to constitute a qualified disability.

As established case law provides, to present a prima facie case of disability discrimination, Charging Party is required to establish that he is a disabled person under the law. In order to gain protection as a disabled individual, Charging Party must show that he has a "physical or mental impairment that substantially limits one or more of the major life activities." 42 USC §12102. Charging Party has presented no evidence whatsoever to suggest that he meets this requirement.

Further, Courts universally agree that an employer cannot terminate an employee "because of" a disability, when the disability is not known to the employer. See Taylor v. Principal Financial Group, Inc. 93 F.3d 155 (5th Cir.1996); Miller v. National Cas. Co. 61 F.3d 627 (8th Cir.1995); Hedberg v. Indiana Bell Telephone Co., Inc. 47 F.3d 928 (7th Cir.1995).

Here, Charging Party never informed the Company that he had a disability or any other type of serious medical condition, and he never asked for any type of accommodation. In fact, throughout the course of his employment, and in response to his many disciplinary warnings, Charging Party often submitted written rebuttals challenging his discipline and the evaluation of his performance. Despite pages and pages of written responses by Charging Party, not once did he ever mention a medical condition or indicate the need for any type of assistance or accommodation. See Written Rebuttals, attached as Exhibit S.[1]

In reviewing Charging Party's termination in response to this Charge, the Company does recall one vague statement made by Charging Party at the time of his termination. Although the exact comment cannot be recalled, Charging Party did make some statement around the time of his termination about a "problem with his eye." The Company has no way of knowing whether this is the basis of his disability claim. Regardless, such a vague statement certainly cannot be considered notice of a disability. See Morisky v. Broward County, 80 F.3d 445, 448 (11th Cir.1996) (vague or conclusory statements about some general incapacity are not sufficient to put an employer on notice of

---

[1] Charging Party also never filed an internal complaint alleging any type of discrimination – gender, national origin or disability - despite the Company's EEO and Open Door Policy. See Policies, attached as Exhibit T.

a disability under the ADA); see also Huppenbauer v. May Dept. Stores Co., 99 F.3d 1130 (4ᵗʰ Cir. 1996) (same). Further, even if this constituted notice, which it clearly does not, an employee cannot avoid termination by asserting a disability after the terminable offense has already taken place. See Smith v. Island Transit, 98 F.3d 1346 (9ᵗʰ Cir. 1996).

The bottom line is that the Company had no prior knowledge of any qualifying medical condition and Charging Party never requested any type of assistance or accommodation. As all of the evidence herein demonstrates, Charging Party's termination was the result of one thing only: his continued poor performance despite years of warnings, performance improvements plans and progressive discipline. Accordingly, there simply is no basis for his allegation that the Company terminated him because of a disability or failed to provide a reasonable accommodation.

**C.   Charging Party Was Terminated for Legitimate, Non-Discriminatory Reasons: An Extensive & Established Pattern of Poor Performance**

As the evidence provided herein demonstrates, Charging Party was terminated for legitimate, non-discriminatory reasons.

For more than 4 years Charging Party exhibited serious performance problems in his job. On endless occasions, Charging Party was counseled and warned about these serious problems. As described in more detail above, the extensive progressive discipline and warnings provided to Charging Party were as follows:

- In July 2002, Charging Party was warned in his Performance Appraisal that his error rate and accuracy problems were unacceptable. See Exhibit D;

- In July 2003, Charging Party was again warned about the unacceptable nature of his performance. See Exhibit E;

- In July 2003, Charging Party was placed on a 90-Day Performance Improvement Plan. See Exhibit F;

- In June 2004, Charging Party was issued a final warning for aggressive and confrontational behavior toward a new employee. See Exhibit H;

- In September 2004, Charging Party was warned in his Performance Appraisal that his performance problems had risen to an unacceptable level and his job was in jeopardy. See Exhibit I;

- In August 2005, Charging Party was again warned that his continued poor performance was placing his job in jeopardy. See Exhibit J;

- In August 2005, Charging Party was issued a Written Warning for further performance and accuracy problems. See Exhibit K;

---

7250 E. Alta Sierra Dr. • Scottsdale, Arizona 85262

October 6, 2006
Page 9 of 9

- In October 2005, Charging Party was placed on suspension and given a Final Warning for continued performance problems. See Exhibit L;

- In March 2006, numerous employees began complaining about the negative impact of Charging Party's performance problems. See Exhibit M; and

- In April 2006, Charging Party committed a serious error which resulted in 2 identical ads being run twice in the newspaper and one separate ad being omitted from publication. Finally, Charging Party's employment was terminated for poor performance. See Exhibits N, O & P.

Given Charging Party's extensive record of failing to meet performance standards and all of the progressive discipline issued by the Company, it is clear that he was terminated for legitimate, non-discriminatory reasons.

For all of the reasons detailed above, Charging Party's Charge should be dismissed.

## III.    CONCLUSION

We believe this Position Statement fully responds to all relevant inquiries set forth in the Charge and clearly shows that the Charge of discrimination by David Ovalle is without merit. Accordingly, the Company respectfully requests that the Commission enter a no-cause decision in its favor. Thank you for providing The Fresno Bee with the opportunity to respond to this Charge. If we can be of further assistance to you, please do not hesitate to call.[2]

Very truly yours,

Billie S. McConkey

cc: The Fresno Bee

---

[2] The Company reserves the right to add to or amend its position if and when additional information becomes available.

7250 E. Alta Sierra Dr. • Scottsdale, Arizona 85262

*Thurs 3:00*

**The Fresno Bee**
Central California's Leading Newspaper

1626 E Street
Fresno, CA 93786

*An Equal Opportunity Employer*

# Employee Advancement/Transfer Request
*Complete both sides and return to the Human Resources Department.*

Name ___ Ovalle _____ David _____ D. ___
          Last              First            Middle

Address __ 4561 E. Jensen (34) Fresno Ca. 93725    441-0169 __
          Street                    City                Zip         Home Phone

Date submitted _____ Date of hire __3-12__ Current title __Prepress employee.__

Length of time in present position __Mo.__ Dept/Shift __Nightshift__ Work Phone __6359__

**REQUEST CONSIDERATION FOR:**

Job title __Ad Tech. Creative Services__

Department __Design Center__

Location/City __The Bee Fresno Ca.__

**SUMMARIZE** any special skills and/or related experience which help qualify you for this position.

Skills and experience directly related with Ad Tech. role were learned from Customer relations and copy Due to Faxing Corrections and revising last minute changes stemmed from a competetive market, my goals were to proof with good communication skills and minimize any in-house corrections my duties consiste of Mark-ups, Layout + Design, paste-up/comp, bluelines, Color keys, Color cutting, plate making and Corrections. Working with some accounts from Conce. through out phases into the Press Room for print production

**CAREER OBJECTIVES**
What are your career objectives? How does this position fit into your goals? My objectives are to utilize my skills and continue to learn all aspects of my role, if given the opportunity I would not only Master my position but would Like to learn any and all related aspects to my position.

The nature of the Ad business is a highly competetive one that requires a committed staff that communicate and produce under pressure and excel Efficient turnaround with The No mistakes I have a Good awareness of the Bee's Ads ar your departments expectations

**Exhibit A**

#1

Ovalle,David D
Ad Creation/Design / FB10800
Ad Techinician / FB1120
Job Function = ADV
Full-Time / Nonexempt
EEO = Clerical

## FRESNO BEE
## POSITION RESPONSIBILITY QUESTIONNAIRE

### Summary Data

Name: David Ovalle          Telephone Ext.: 6237  Title: Ad Tech.

Department: Ad Creation / Design CTR.  Location: FRESNO Bee

Date of Hire: 3.17.96          Time in Position: 5 yrs

Immediate Supervisor: Mary Feusal          Title: Supv.

1.    Function. State in three or four lines the essential purpose of your position. What distinguishes your job from another? Provide a brief but adequate picture of the size and scope of your position.

My Purpose is to provide immediate service to our Acct/Reps by way of Quality production and gathering of all print components and customer satisfaction by way of Proof approval and expectations within our Production Deadlines.

2.    Primary responsibilities and activities. List all activities occupying the major part of your time and which are characteristic and outstanding elements of your work routine. If you perform the activity it should be so stated. If you manage or if you share the responsibility with another person, use action verbs such as supervises, coordinates, and cooperates with.

| Responsibility/Activity | % of Time |
|---|---|
| Ad mat. check in. | 30% |
| Proof clearance | 12% |
| Proof Reserch | 14% |
| SV Standard Section Acct. | 8% |
| SV Special Section Acct. | 5% |
| phone Reserch (call ins) | 10% |
| Rep Guidance | 21% |

On the next page, please list at least ten activities in the order of their importance. Indicate the *approximate* percentage of time devoted per week to each responsibility. (Should total 100%).

**Exhibit B**

| No. | Duties and Responsibilities | % of Time |
|---|---|---|
| 1. | ~~AD TRAFFIC for Proof~~ clearance SV EDition Coord. | 5% 4% |
| 2. | SV Special Sec or themes coord. | 3% |
| 3. | VISA city Veiw Coord. | 3% |
| 4. | Reserching Ad numbers, ARTWORK ect. | 12% |
| 5. | Proof clearance and mark-ups | 7% |
| 6. | Phone service and Information | 10% |
| 7. | check notes and Proof Shooting | 17% |
| 8. | Ad survey / unisys and Supervisor | 15% |
| 9. | Ad check in and Processing | 30% |
| 10. | | |

3. **Position Complexity.** Please describe two of the most complex and difficult problems typically encountered in your position during the year.

I have not met a challenge of great difficulty, Although two area's of My Concern would be Ad prioritizing, for reasonable proof turnaround and a Sense of urgency to get the revises requsted to our accounts, and Reps. with account-ability

4. Describe briefly any duties you perform occasionally, such as weekly or monthly (not listed above) or by special assignment. How much time (hours) is required to carry out these assignments? Also estimate how often each duty is performed.

| Duties and Responsibilities | Time (Hrs.) | Estimate How Often Duty Performed | | |
|---|---|---|---|---|
| | | Weekly | Monthly | Annually |
| Rep Research Tearsheets | .50/30 min. | 3 | 12 | 144 |
| Adjustments by Cause (SV) | 0 | 0 | 0 | 0 |
| Quality of Email ready ADS | .75/45 min | 2 | 8 | 96 |
| Agency and Newspaper Communication for Quality Ad transmission for Advance troubleshooting, Problem spotting and preference settings. | .25/15 min | 2 | 4-8 | 48-96 pending - poor work (use Adv. Flow or quality issues |

**Exhibit B, Page 2**

OCT 0 2 1998

THE FRESNO BEE
3 MONTH JOB
PERFORMANCE PROGRESS REPORT


David Ovalle
Employee

Ad Creation/Design Center
Department


7/16/98 to 10/16/98
Evaluation period

Ad Technician
Job Classification (Title)


T.J. Gilchrist
Team Leader


Next Review Date: 1-16-99


**Exhibit C**

I.    JOB RESPONSIBILITIES

How well is the new employee learning and performing the responsibilities of his/her position?

David continues to learn the duties of the ad tech position. His ability to check dockets for proper layout, copy and art is good and improving. David is also gaining more experience in logging in ads, proof shooting, proof reading, scanning and other duties of Ad Tech position.

II.   WORK TRAITS

What type of work traits is the new employee exhibiting?

David demonstrates a very good work ethic. He is courteous when working with our sales reps, prepress personnel and customers on the phone. David is always eager to fulfill all requests he receives.

III.  POLICIES AND PROCEDURES

How well does the new employee comprehend and follow company and departmental policies and procedures?

David complies with all policies and procedures known to him.

IV.   CUSTOMER/STAFF RELATIONS

How well does the new employee interact with customers and co-workers?

David interacts with his co-workers and the personnel staff of other departments very well. He is becoming more proficient assisting customers with their needs and doesn't hesitate to ask questions when a situation arises in an area that he is unfamiliar with.

**Exhibit C, Page 2**

**V.    AREAS OF STRENGTH**

What areas, if any, does the new employee show better-than-
expected performance given the time on the job?

David has grasped the fundamentals of the Ad Tech position
and continues to gain more experience with time on the job.
He learns and implements new techniques effectively and is
becoming more accurate.

**VI.    AREAS FOR IMPROVEMENT**

What specific knowledge, behavior or skills should this
person develop or improve to upgrade his/her job
performance?

It is important to continue learning more about checking
all the information and material that is contained in the
dockets at the check in station, as well as to keep gaining
knowledge in all areas of the Ad Tech position.

**VII.    OVERALL PERFORMANCE**

How well is the employee performing in regards to the amount
of time on the job?

Overall, David continues to perform and improve his job
duties very well. He retains information and implements new
procedures without to many problems.

**VIII.    ADDITIONAL COMMENTS:** _I feel T.J. has provided me_
_with more than adequate guidance I feel there_
_is much more areas to expand and grow and_
_look forward to progress especially in the scanning area_

Employee signature: _____    Date: 9/25/98

Supervisor's signature: _____    Date: 9/25/98

Dept. Mgr.'s signature: _____    Date: _____

Dept. Dir.'s signature: _____    Date: 10/1/98

Gen. Mgr.'s signature: _____    Date: _____

Personnel Dir.'s signature: _____    Date: 10/1/98

**Exhibit C, Page 3**

AUG 0 8 2002

# The Fresno Bee

## Annual Performance Appraisal
## Ad Creation/Design Center

**David Ovalle** _____    Date **7/19/02**
Name

**Ad Technician** _____
Position

**7/19/01-7/19/02** _____
Evaluation

Employee Signature _____    Date 7/3)

*See that pg. for comments pending.*

Team Leader _____    Date 7/31/02
Team Coordinator _____    Date 7/31/02
Department Manager _____    Date 8-2-02
VP of Operations _____    Date 8-5-02
Publisher _____    Date _____
HR Director _____    Date 8-7?

**Exhibit D**

### Part 1 - JOB RESPONSIBILITIES

| | | | Meets Expectations | Does Not Meet Expectations |
|---|---|---|---|---|
| ☺ | 1. | Accurately initiates all ads into the Adman tracking system | X | |
| ☺ | 2. | Accurately checks ads/proofs for acceptable layout and ad copy | X | |
| ☺ | 3. | Accurately checks ads/proofs for acceptable art work | X | |
| | 4. | Clears daily ads to meet press schedule | X | |
| | 5. | Uses apparopriate stamps on all ads material | X | |
| | 6. | Shoots and distributes proofs to couriers and sales reps. | X | |
| ☺ | 7. | Accurately proof reads ads when necessary | X | |
| | 8. | Locates missing ads | X | |
| | 9. | Writes check notes for couriers | X | |
| | 10. | Files and recycles negatives and dead copy daily | | X |
| | 11. | Processes South Valley ad material. | X | |
| | 12. | Demonstrates the ability to handle additional responsibilities as assigned | X | |

Comments:
David is doing a good job of servicing the South Valley office.  Some of the SV staff has communicated to AC/DC management their satisfaction with David's handling of SV materials.

David does not file negatives on a daily basis and needs to be reminded on occasion that it needs to be done.

David needs to be more attentive when checking in ads, clearing proofs and matching ad man tickets to ads. During this review period David has missed, on occasion, including proof/negs info in Beeprint ads, as well as, not attaching the correct Adman tickets to ads. Due to the volume of ads processed in the Design Center these mistakes are minimal, but the impact to the production process and ultimately to the customer can be costly.

### PART 2 - POLICIES AND PROCEDURES

| | | | Meets Expectations | Does Not Meet Expectations |
|---|---|---|---|---|
| ☺ | 1. | Maintains records and follows procedures in accordance departmental policies, including time cards, vacation forms, sick leave forms report forms and etc. | X | |
| | 2. | Attendance: Total hours absent __81.75__ | | X |
| | 3. | Understands and adheres departmental safety policies and procedures. | X | |
| | 4. | Adheres to departmental dress codes and represent the company in a professional manner. | X | |
| | 5. | Adheres to the company employee handbook. | X | |

Comments:
David has used a total of 81.75 hours this review period, 16.75 hours between July/Dec. 2001  and 65.0 to date in the 2002 calendar year.

### PART 3 - COMMUNICATION/CUSTOMER AND STAFF RELATIONS

| | | | Meets Expectations | Does Not Meet Expectations |
|---|---|---|---|---|
| ☺ | 1. | Demonstrates good listening skills; understands and processes information. | X | |
| ☺ | 2. | Follows written and verbal instructions and directions as provided. | X | |
| ☺ | 3. | Communicates clearly and professionally with customers and co-workers. | X | |
| ☺ | 4. | Responds positively to requests and concerns of customers and co-workers | X | |

**Exhibit D, Page 2**

😊  5. Demonstrates awareness of interdepartmental reporting responsibilities and relationships.    __X__  _____

😊  6. Exhibits positive attitude and demeanor at work to promote a good working atmosphere    __X__  _____

😊  7. Determines appropriate communication method for each situation and utilizes e-mail, phone-mail and
memos when appropriate.    __X__  _____

Comments:
For the most part David effectively communicates with supervisors, co-workers and sales staff. However circumstances have occurred during this review period that not all SV ads were accounted for at the end of his shift and the night staff was not communicated to on what still needed to be done. He also needs to inform staff and or supervisors when leaving area for breaks/lunch or simply on a mission. We often do not know his whereabouts when he leaves the area.

## PART 4 - WORK TRAITS

| | Meets Expectations | Does Not Meet Expectations |
|---|---|---|
| 😊  1. Consistently represents the company in a professional manner. | X | |
| 2. Punctual to work, meetings and appointments. | X | |
| 3. Avoids delaying the work of others within the department and other departments. | X | |
| 4. Demonstrates ability to retrieve information quickly and accurately. | X | |
| 5. Demonstrates flexibility in solving problems and improving processes. | X | |
| 😊  6. Demonstrates initiative, offering assistance without being asked, fulfills job responsibilities with little or no supervision. | X | |
| 7. Consistently completes assigned work to meet deadlines, while demonstrating the ability to coordinate multiple assignments when the unanticipated occurs. | X | |
| 😊  8. Consistently supports the team effort when workload increases, including overtime. | X | |
| 9. Demonstrates sound application of skills learned through training. | X | |
| 10. Uses work time effectively. | X | |
| 😊  11. Completes work thoroughly and accurately | X | |
| 😊  12. Makes full and efficient use of the technology provided by the company. | X | |
| 😊  13. Demonstrates the ability to handle additional responsibilities. | X | |

Comments: As stated above, being more attentive when checking in the various types of ads will overall improve accuracy and thoroughness.

I have observed how David handles certain operations of the South Valley desk and, in my opinion, believe there is room for those operations to be handle more efficiently to allow for time spent on other duties of the Ad Tech position.

| | Meets Expectations | Does Not Meet Expectations |
|---|---|---|
| Overall performance rating | X | |

Comments:

Goals: Work with your Team Leader and Team Coordinator on more efficient ways to handle certain operations of the South Valley desk, as well as, train other team members the operation of the South Valley desk for vacation relief.

Development:

*Comments: Pending 7/31 to be turned in 8-1 [signature]*

**Exhibit D, Page 3**


AUG 0 8 2003

# The Fresno Bee

## Annual Performance Appraisal
## Ad Creation/Design Center

**David Ovalle**
Name                                                          Date  **7/21/03**

**Ad Technician**
Position

**7/19/02-7/21/03**
Evaluation

Employee Signature                                           Date  7/24/03

Team Leader                                                  Date  8/6/03

Team Coordinator                                            Date  8/6/03

Department Manager                                          Date  8-6-03

VP of Operations                                           Date  8-7-03

HR Director                                                 Date  8/1/03

**EXCEPTIONAL:** Performance is consistently at an exceptionally high level.

**SUPERIOR:** Performance is consistently good and will frequently reach a higher level.

**COMMENDABLE:** Performance consistently meets expectations and may occasionally reach a higher level.

**INCONSISTENT:** Performance does not consistently meet expectations and minimum requirements.

**UNACCEPTABLE:** Performance shows consistent deficiencies that seriously interfere with the ability to meet minimum requirements.

**Exhibit E**

**Part 1 - JOB RESPONSIBILITIES**

| | | Exceptional | Superior | Commendable | Inconsistent | Unacceptable |
|---|---|---|---|---|---|---|
| ☺ | 1. Accurately initiates all ads into the Adman tracking system | | | | X | |
| ☺ | 2. Accurately checks ads/proofs for acceptable layout, ad copy and artwork | | | X | | |
| ☺ | 3. Accurately checks for current storage numbers | | | | X | |
| | 4. Clears daily ads to meet press schedule | | | X | | |
| | 5. Uses apparopriate stamps on all ads material | | | X | | |
| | 6. Shoots and distributes proofs to couriers and sales reps. | | | X | | |
| ☺ | 7. Accurately proof reads ads when necessary | | X | | | |
| | 8. Locates missing ads | | | X | | |
| | 9. Writes check notes for couriers | | | X | | |
| | 10. Processes South Valley ad material. | | | | X | |
| | 11. Demonstrates the ability to handle additional responsibilities as assigned | | | X | | |

**Comments:**



David needs to be more attentive to the basics of checking in ads, clearing proofs, matching ad man tickets to ads and having ad numbers restored. During this review period some ads were returned to David, before publication, with the wrong adman tickets or ads attached to them. One example is in May 2003 Lori in the SV office noticed in Supervisor, that a Morris Levin ad was in the place of a The Rocks ad on a Mother's Day theme page to published on May 9. She brought it to management's attention and it was discovered that the wrong ad man ticket was attached to the ad. As recently as June 27, ad copy was returned to David that had a Yosemite Furniture adman ticket attached to a Palace Bingo ad.  On January 26 of this year Party Works was processed by David and ran incorrectly due to the wrong adman ticket being attached. He also picked up the wrong Eagle Mountain Casino ad on May 4, 2003 resulting in $872+ loss of revenue. David has also missed expired storage numbers when checking in ads this review period resulting in some cases, the delay of production because the A.M. Ad Tech had to have the number restored.

David services the SV office with good results. The staff of the South Valley office has often said that David is very helpful in processing their ads and is a pleasure to work with, however, often ads will sit on the SV desk for long periods of time. David has stated that he may receive a revise for one of the ads, and he also says he has until 5:00pm to turn in those ads. If David knows for a fact that a revise is coming it would be ok to hold an ad, but if not all the ads should be processed as soon as possible, to minimize the impact of work on others who are accounting for daily or pre-run ads.

Due to the volume of ads processed in the Design Center the abovementioned errors maybe minimal, but the impact to the work flow, co-workers and ultimately, to the customer can be costly.

**PART 2 - POLICIES AND PROCEDURES**

| | | Commendable | Inconsistent | Unacceptable |
|---|---|---|---|---|
| ☺ | 1. Maintains records and follows procedures in accordance departmental policies, including time cards, vacation forms, sick leave forms report forms and etc. | X | | |
| | 2. Attendance: Total hours absent ___65.25___. | | X | |
| | 3. Understands and adheres to departmental policies and procedures. | | X | |
| | 4. Adheres to departmental dress codes and represent the company in a professional manner. | X | | |
| | 5. Adheres to the company employee handbook. | X | | |

**Comments:**

David has used 65.25 hours of sick leave this review period.

The department policy is not to leave the department unattended as well as no breaks or lunches at same time as other co-workers without supervisor ok.  Instances have occurred where the department has been left unattended, therefore it is important for David to be aware of staffing and communicate with co-workers when needing to leave the area for breaks/lunch or department business.

**Exhibit E, Page 2**

## PART 3 - COMMUNICATION/CUSTOMER AND STAFF RELATIONS

| | Commendable | Inconsistent | Unacceptable |
|---|---|---|---|
| 1. Demonstrates good listening skills; understands and processes information. | X | | |
| 2. Follows written and verbal instructions and directions as provided. | X | | |
| 3. Communicates clearly and professionally with customers and co-workers. | | X | |
| 4. Responds positively to requests and concerns of customers and co-workers | | X | |
| 5. Demonstrates awareness of interdepartmental reporting responsibilities and relationships. | X | | |
| 6. Exhibits positive attitude and demeanor at work to promote a good working atmosphere | | | X |
| 7. Determines appropriate communication method for each situation and utilizes e-mail, phone-mail and memos when appropriate. | X | | |



**Comments:**
During this past review period, David has had some problems communicating with and relating to his co-workers and superiors. David will often come to work with an inconsistent demeanor and proceed to the South Valley desk without acknowledging his co-workers or superiors with a greeting unless initiated by someone else. It has also been observed that sometimes, when David is asked a question his response is not directed back to the person who asked it, he would answer the question but in an inaudible voice and not look at the person who asked it. David doesn't take constructive criticism very well. He will often be on the defensive when his supervisors have discussions with him about any problems or situations that may develop in the department that day. This disposition is not conducive to a harmonious and productive work environment and doesn't support the AC/DC departments approach to the Team Concept. David needs to improve his communication skills and develop a positive working relationship with co-workers and superiors so he can build trust, respect and a rapport with them.

David also needs to do a better job informing his co-workers on the status of the South Valley desk when he leaves for the day. Circumstances have occurred during this review period that not all SV ads were accounted for at the end of his shift and the night staff was not informed to what still needed to be done. This also includes advertising material being sent up by fax or on the south valley pouch. The latest incident happened. June 24. Copy arrived from SV, via courier or fax and was on the SV desk. Confirmation tickets were generated from Data Entry after David left for the day. Neither ad tech was informed that there were ads to be processed on the SV desk.

As stated in Policies and Procedures, David needs to inform a co-worker or a supervisor when leaving the work area for breaks/lunch or simply on an errand. This is not only a common courtesy but is also a department policy.

## PART 4 - WORK TRAITS



| | Commendable | Inconsistent | Unacceptable |
|---|---|---|---|
| 1. Consistently supports the "TEAM" concept | | | X |
| 2. Avoids delaying the work of others within the department and other departments. | | X | |
| 3. Demonstrates ability to retrieve information quickly and accurately. | X | | |
| 4. Demonstrates flexibility in solving problems and improving processes. | X | | |
| 5. Demonstrates initiative, offering assistance without being asked, fulfills job responsibilities with little or no supervision. | X | | |
| 6. Consistently completes assigned work to meet deadlines, while demonstrating the ability to coordinate multiple assignments when the unanticipated occurs. | X | | |
| 7. Consistently supports co-workers when the workload increases, including overtime. | | X | |
| 8. Demonstrates sound application of skills learned through training. | X | | |
| 9. Uses work time effectively. | | X | |
| 10. Completes work thoroughly and accurately | | X | |
| 11. Makes full and efficient use of the technology provided by the company. | X | | |
| 12. Demonstrates the ability to handle additional responsibilities. | X | | |

**Exhibit E, page 3**